UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| MARK MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-513 (PLF) |
| | ) | |
| FEDERAL BUREAU OF PRISONS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

OPINION

Plaintiff Mark Miller is a prisoner in federal custody. He filed a *pro se* complaint asserting a variety of statutory and constitutional claims against the Federal Bureau of Prisons ("BOP") and two BOP employees in their personal capacities for a variety of alleged acts and injuries. The defendants have moved to dismiss the complaint under several provisions of Rule 12(b) of the Federal Rules of Civil Procedure or, in the alternative, under Rule 56 for summary judgment. The defendants' motion for summary judgment will be granted.

I. BACKGROUND

Miller was arrested, convicted, and sentenced to imprisonment in 2005 in connection with his conviction for possession with intent to distribute cocaine. Miller filed this complaint about events that occurred in 2008 while he was confined at a low security BOP facility at the United States Medical Center for Federal Prisoners in Springfield, Missouri. Miller requested a transfer to a minimum, *i.e.,* lesser, security facility. Defs.' Mot. to Dismiss or for Summ. J. ("Defs.' Mot."), Declaration of Eric Banta (April 24, 2009) ("Banta Decl.") Att. A,

Sec. 3. Eric Banta, Miller's case manager at the time and now a defendant in this suit, prepared a transfer request for Miller to a less restrictive environment, a minimum security facility, and submitted it to the BOP's transfer authority, the Designation and Sentence Computation Center in Grand Prairie, Texas. Banta Decl. ¶¶ 4-6 & Att. A. Section 5 of the transfer request form requires BOP staff to "[n]ote any past or present behavior and/or management concerns." Banta Decl. Att. A, Sec. 5. Banta prepared the transfer request in accordance with BOP procedure, codified at Program Statement 5100.08, which instructs the preparer to include in Section 5 the inmate's "history of arrests and disruptive behavior which may not hve resulted in a conviction." Banta Decl. ¶ 7 & Ex. B. All of the information Banta included in the transfer request was derived from Miller's pre-sentence investigation report ("PSR") prepared before sentencing by the Probation Officer. *Id.* ¶ 8.

Among the information Banta reported in Section 5 of the transfer request were the following two incidents that had resulted in charges that were later dismissed:

> September 27, 1997, Mr. Miller was arrested for Aggravated Assault, Driving Under the Influence, Leaving the Scene of an Accident, Stop Sign and Speeding in Lawrence Kansas. Lawrence police officers responded to an aggravated assault call in which the complainant advised officers Mark Miller entered her apartment through the rear sliding door, was holding a black semi-automatic handgun, and was walking around the apartment brandishing the gun. The complainant noted Mr. Miller had been at her apartment earlier in the evening and had been in an argument with his ex-girlfriend. Both Mr. Miller and his ex-girlfriend left the apartment, with Mr. Miller returning later with a firearm. The complainant reported she was frightened by Mr. Miller and got her 16-month-old son, exited the apartment and went to another apartment to call the police. Other witnesses were in the apartment observing Mr. Miller wielding the firearm. The witnesses reported Mr. Miller had left the area in a vehicle driving westbound. Kansas University police officers later located the vehicle wrecked at an intersection.

Witnesses at the scene advised officers Miller had fled the scene on foot. Miller was located running toward Wescoe Hall on the University campus. The arresting officer noted Mr. Miller appeared intoxicated and was vomiting on himself. Inside Mr. Miller's pants pocket was a 9 mm magazine with nine 9 mm bullets. The handgun possessed by Mr. Miller was located near Murphy Hall on the University campus. The gun was identified as a Ruger 9 mm pistol. Law enforcement officers determined the Ruger 9 mm pistol was the same pistol used during the May 5, 1997 incident [also involving Miller]. The motion to dismiss filed by the prosecutor indicates the lab report regarding blood analysis was not received in time for the jury trial. In addition, essential witnesses were not located.

On December 24, 1999, Mr. Miller was arrested for First Degree Murder in Oklahoma City, Oklahoma. Charging documents reflect on December 24, 1999, Oklahoma City police officers were dispatched to a shooting call at an apartment complex in northwest Oklahoma City. When officers arrived they found the apartment occupied by seventeen individuals and four people have been shot. One of the victims was transported to an area hospital where he later died. Prior to his death, the victim told an officer he was shot by "Greedy". The three other victims were transported to area hospitals and survived their injuries. Witnesses advised officers that approximately four to twelve black male subjects surrounded the exterior of the apartment building and opened fire on the apartment witnesses identified the subjects as Bloods gang members. One of the gang members was identified by the occupants of the apartment as "Greedy". Two witnesses/victims stated they saw "Greedy" standing outside the apartment with a group of black male subjects seconds prior to the shooting. Through investigation "Greedy" was identified as Gregory Lewis and was found to have had past conflicts with the occupants of the apartment. Officers learned that on December 17, 1999, three of the victims were involved in an altercation with "Greedy" in which "Greedy" was beaten up. Since that time, the victims/witnesses stated that they had been threatened and harassed by "Greedy". Later in the investigation officers determined Mark Miller used the alias name of Gregory Lewis and the street moniker "Greedy". The charge of First Degree Murder was dismissed at the request of the state due to lack of evidence.

Compl., Att. 1; Banta Decl. Att. A; *see also* Opp'n Att. C (memorializing a statement by John Jacobsen, first assistant district attorney for Oklahoma County and Oklahoma City, Oklahoma, explaining that the first degree murder charge against Miller was dropped because "Miller's alibi checked out.").[1]

None of the information reported in Section 5 of the transfer request related to events that occurred later than 2000. *See id.* The BOP's transfer authority denied the request. Banta Decl. ¶ 9. Miller promptly filed an "Inmate Request to Staff" challenging "all the allegations for wrong doing in the dismissed charges in my PSI as false . . . ." Banta Decl. Att. E.

Shortly thereafter, at Miller's request, Banta asked the U.S. probation officer who authored Miller's PSR to review the accuracy of the arrest information in the PSR. Banta Decl. ¶¶ 10-11. The probation officer verified the accuracy of the information. *Id.* ¶ 11. As a result of the challenge to the accuracy of Miller's criminal history information in his PSR, Miller's unit team undertook "a comprehensive re-review." Opp'n Att. M. This review resulted in an increased "history of violence ("HOV")" score for Miller, based on an incident in 2002 that was not reflected in his arrest history in the transfer request. *Id.* ¶ 12.

A few months later, in response to a request from Miller for a transfer to a Residential Drug Abuse Program ("RDAP"), Banta prepared another transfer request; this time the transfer was approved by DSCC. Banta Decl. ¶ 14 & Ex. I, Sec. 3; *see also* Opp'n at 13 ("Plaintiff requested . . . the drug program."). Miller was transferred to a RDAP program located in a medium security institution near his home of record, which is one security level more

---

[1] The document appended to Miller's opposition as Attachment C was also appended to his complaint as Attachment 2, but the critical information is illegible in the copy attached to the complaint.

restrictive than a low security facility. *Id.* According to the BOP website, Miller is currently housed at the Federal Correctional Institution in Seagoville, Texas, a low security institution that has a satellite camp for prisoners with a minimum security classification. Miller has not notified this Court of his change of address.

Miller sues Banta and Marty Anderson, his warden at the time, for "knowingly including false information in the request for transfer." Compl. at 1; *see also id.* at 2. He further alleges that after he filed his request for an administrative remedy challenging the allegedly false information, he was subjected to retaliation in the following ways: (1) that Banta and Anderson increased his HOV score; (2) that he was placed for one night in a Special Housing Unit ("SHU") without cause; (3) that he was transferred to a medium security institution; and (4) that his civil complaint was removed from the outgoing prison mail. Compl. at 2. Based on these allegations, he asserts claims under the Privacy Act, 5 U.S.C. § 552a, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997, and the First and Fourth Amendments to the Constitution. Compl. at 2. He seeks $50 million in damages and asks that his "files be corrected." *Id.* at 3.[2] In addition to filing Banta's declaration addressing the merits of the allegations, the defendants have also filed a declaration establishing that Miller did not exhaust the BOP's inmate administrative remedy process before filing this lawsuit with respect to three of his allegations of retaliation: (1) that he was placed in

---

[2] In his opposition, Miller contends that Banta and Anderson have submitted false statements in this litigation and asks this Court to institute criminal proceedings against them. Anderson did not submit any statements to this Court and there is no evidence that Banta's declaration includes any false statements. The Court finds no support whatsoever in this record for Miller's accusations; indeed, Miller's accusations of false statements appear to be not only without merit, but also frivolous if not malicious.

the SHU without cause; (2) that he was transferred to a higher security institution; and (3) that his civil complaint was removed from the outgoing prison mail. Defs.' Mot., Declaration of Joe McGuire (May 12, 2009) ("McGuire Decl.") ¶¶ 5-6.

## II. LEGAL STANDARDS

On a motion to dismiss, a *pro se* complaint is to be liberally construed in favor of the plaintiff. *Haines v. Kerner,* 404 U.S. 519, 520 (1972). In determining whether a complaint fails to state a claim upon which relief may be granted, a court generally "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and "grant plaintiffs the benefit of all inferences that can be derived from the facts alleged," but need not accept either a plaintiff's legal conclusions, or inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (internal quotation marks and citations omitted).

As the plaintiff has been previously advised, *see* Order, May 27, 2009, when a court considers matters outside the pleadings that have been presented with a motion to dismiss under Rule 12(b)(6), "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). On a motion for summary judgment, "[t]he inquiry performed is the

threshold inquiry of determining whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A material fact is one that is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby,* 477 U.S. at 248. A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the nonmovant. *Id.* at 255. The nonmoving party, however, must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, the nonmovant must "set out specific specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In the end, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. The Unexhausted Retaliation Claims

In pertinent part the PLRA provides that:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This exhaustion requirement is mandatory and "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle,* 534 U.S. 516, 520 (2002). A prisoner must complete the administrative remedy process "regardless of the relief offered through administrative avenues." *Booth v. Churner,* 532 U.S. 731, 740-41 (2001). In short, a prisoner may file a civil action concerning the conditions of his confinement under federal law only if he has first exhausted all the administrative remedies the BOP has made available. *See Elliott v. Fed. Bur. of Prisons,* 521 F. Sup. 2d 41, 49-50 (D.D.C. 2007). While exhaustion is a mandatory prerequisite of filing a civil action, a plaintiff is not required to plead that he has exhausted his administrative remedies. Rather, exhaustion under the PLRA is properly treated as an affirmative defense and analyzed as a motion for summary judgment. *Jones v. Bock,* 549 U.S. 199, 216 (2007).

The defendants have filed an agency declaration establishing that Miller did not exhaust his administrative remedies with respect to three of his claims of retaliation — that he was placed in the SHU, that his complaint was removed from the mail, and that he was transferred to a higher security institution. McGuire Decl. ¶¶ 5-6. Miller has not shown otherwise through affidavit, declaration or other competent evidence. Accordingly, as there is no genuine issue of

material fact as to whether Miller failed to exhaust his administrative remedies before filing suit, and the defendants are entitled to judgment as a matter of law, judgment will be awarded to the defendants on any claims arising from these three events.

### B. *Claims Arising from the Alleged False Statements*

The defendants are entitled to judgment on any claims arising from the allegation that the defendants knowingly included false statements in the transfer request. Quite simply, Miller has not shown that the transfer request included any false statements. Miller does not offer any evidence to dispute that he was, in fact, charged with aggravated assault in 1997 and with first degree murder in 1999, as was recorded in his PSR and reflected in Banta's transfer request. While Miller objects to the fact that the first degree murder indictment is mentioned in the transfer request, his own submissions concede that he was, in fact, indicted for first degree murder and that the charge was later dismissed. *See* Opp'n at 5-6 & Att. C. A charge that was brought and dismissed is not a charge that was never brought. Miller's undisputed assertion that the defendants knew that "the plaintiff had an alibi for the time of the murder," Opp'n at 5, does not mean — as Miller seems to think, *see id.* at 5-6 — that one makes a false or inaccurate statement if one reports that charges were brought and later dismissed. On this record, no reasonable jury could find that the defendants made false or inaccurate statements. Therefore, the defendants are entitled to judgment on any conceivable claim arising from Miller's allegations of false statements in the transfer request.[3]

---

[3] The defendants are correct, in any case, that Miller cannot maintain a claim under the Privacy Act regarding his PSR because the BOP has exempted its Inmate Central Records System from the accuracy, amendment and remedies provisions of the Act. *See* 28 C.F.R. § 16.97(a)(4); *Brown v. Bureau of Prisons,* 498 F. Supp. 2d 298, 302-03 (D.D.C. 2007).

*C. Retaliation Claims Arising from the Recalculated HOV Score*

Miller alleges that the recalculation of his HOV score was a form of retaliation for filing an administrative grievance. An inmate's HOV score is one of the components used to calculate his custody classification, and therefore, it may affect his place of imprisonment. Although the complaint is far from clear, a liberal reading suggests that Miller might have intended to assert claims under 42 U.S.C. § 1997d, the APA, and the First and Fifth Amendments to the Constitution. *See* Compl. at 2.[4] Neither the statutory nor the constitutional claims for retaliation can survive the defendants' dispositive motion.

Miller's invocation of 42 U.S.C. § 1997d is misplaced. That provision prohibits retaliation for filing complaints against a state or a political subdivision of a state to redress a "pattern or practice" of "egregious or flagrant conditions which deprive [institutionalized] persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm." 42 U.S.C. § 1997a(a); see 42 U.S.C. § 1997d (prohibiting retaliation for filing such a complaint). In multiple respects, this provision is not applicable to Miller's suit. Furthermore, the anti-retaliation provision does not afford a private right of action. *See* 42 U.S.C. § 1997j ("The provisions of this subchapter shall in no way expand or restrict the authority of parties other than the United States to enforce the legal rights which they may have pursuant to existing law with regard to institutionalized persons.") Miller also has no right of action under the APA arising from the recalculation of his

---

[4] Nowhere does the complaint refer to the Fifth Amendment. Rather, it refers to "due process" and the "fourth amendment." Compl. at 2. Since the Fourth Amendment protections have no obvious application on these facts, the complaint will be construed as one intending to assert a Fifth Amendment due process claim.

HOV score because BOP decisions involving custody classification and place of confinement are expressly exempt by statute from judicial review under the APA. *See* 18 U.S.C. § 3625. Thus, the defendants are entitled to judgment as a matter of law on the statute-based claims of retaliation.

The Constitution-based claims of retaliation cannot survive, either. As an initial matter, as an agent of the sovereign, the BOP is not liable for damages on any constitutional claim. *See Lane v. Pena,* 518 U.S. 187, 192 (1996) (holding that the United States and its agencies are immune from suit except insofar as Congress has expressly waived that immunity); *FDIC v. Meyer,* 510 U.S. 471, 484-86 (1994) (holding that Congress has not waived federal agencies' immunity from suit for damages for alleged violations of the Constitution). Federal agents in their personal capacities, on the other hand, may be liable for damages for constitutional torts under a so-called *Bivens* action.[5] Here, however, the Court has no personal jurisdiction over the two individual defendants, which would preclude the claims going forward in this Court, in any case. *See* Defs.' Mot. at 4-5.

Even if this Court did have personal jurisdiction over Anderson and Banta, the constitutional claims would fail on their merits. The due process claim necessarily fails because it is settled law that a prisoner does not have a liberty interest in his place of confinement or custody classification that can be redressed by the due process clause of the constitution. *Olim v. Wakinekona,* 661 U.S. 238, 245 (1983); *Perez v. Lappin,* 675 F. Supp. 2d 35, 42 (D.D.C. 2009) (citing cases). The First Amendment claim fails, as well, because Miller has not shown either that the individual defendants acted illegitimately or with any retaliatory intent. *See Pryor El v.*

---

[5] *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

*Kelly,* 892 F. Supp. 2d at 274 (D.D.C. 1995) (granting judgment to the defendant on a First Amendment retaliation claim "[b]ecause Plaintiff fails to establish that the [government] impermissibly infringed upon his right to engage in a protected activity, and because Plaintiff does not allege that the allegedly retaliatory action failed to advance legitimate goals of the correctional institution, . . . ."). The evidence in this case shows only that Miller challenged the accuracy of his criminal history and then got what he asked for, namely, a review of his criminal history. This review resulted in an updated calculation of his HOV score. There is no evidence in this record to establish that the individual defendants set out to discourage Miller from using the BOP's administrative remedy process to challenge the accuracy of his criminal history as reported in his PSR. To the contrary, the record shows that the defendants cooperated with Miller's request and undertook to review the facts. Miller may regret the result, but in light of the fact that he sought a review of the accuracy of his criminal history, he has failed to show retaliation by the defendants in the recalculation of his HOV score.

IV. CONCLUSION

For the reasons stated above, and after careful consideration of the *pro se* complaint liberally construed, the defendants' motion to dismiss or for summary judgment, the plaintiff's opposition and the defendants' reply thereto, the defendants' motion will be granted and the

defendants will be awarded judgment on all claims. The plaintiff's motion seeking the initiation of criminal proceedings against the individual defendants will be denied.

An Order consistent with this Opinion will issue this same day.

DATED: March 29, 2010

/s/
PAUL L. FRIEDMAN
United States District Judge